Austris A. WIHTOL, Doing Business as Kalnin, Mohr and Apsit, Plaintiff-Appellant,

v.

Kenneth H. WELLS, Defendant-Appellee.

No. 11497.

United States Court of Appeals Seventh Circuit.

April 12, 1956.

Arthur H. Boettcher, Edward C. Grelle, Chicago, Ill., for appellant.

Charles B. Cannon, Chicago, Ill., Wallace & Cannon, Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and LINDLEY and SWAIM, Circuit Judges.

DUFFY, Chief Judge.

This is an action for copyright infringement brought under Title 17 U.S.C., § 1 et seq. The copyrighted work is a musical composition (music and words) entitled "My God and I," published in the United States and copyrighted in September, 1935, by Kalnin, Mohr and Apsit, plaintiff's assumed business name. The copyrighted work came into the Chicago area early in 1937. It was sung by the choir at the First Congregational Church in Evanston, on January 31, 1937, and repeatedly since. From 1936 to 1938 plaintiff personally canvassed some three hundred churches in Chicago, which resulted in the sales of eighty-five hundred copies of "My God and I.". Up to the time of the trial there had been one hundred eighty printings, totaling at least six hundred thousand copies. Plaintiff personally placed and published the first two printings. About 1937 a group of women known as The Kama Company, took over the placing of printing and the publishing, paying plaintiff a commission. The Kama Company was headed by plaintiff's wife. At all times the copies printed carried the copyright notice.

Plaintiff Wihtol was born in 1889 in Riga, then a part of Russia, later a part of Latvia. He studied music in his childhood, and has followed that art professionally all his life. He has written many musical compositions, especially ecclesiastical pieces. He came to the United States in 1909, and to Chicago in 1936. Prior to August 15, 1935, while in California, he wrote the song "My God and I." Plaintiff testified that in his early boyhood, an organ grinder used to make weekly visits to the neighborhood in Riga where plaintiff lived, and that among the tunes played was one similar but not the same as the tune in "My God and I." He testified that he had never heard the song sung. He carried this tune in his mind for many years. Plaintiff's composition was designed primarily for church choirs and had soprano, alto, tenor and bass scores.

The accused composition is also entitled "My God and I." It appears in a song book entitled "Evangel Solos and Duets Number One." This book was published in 1951 by the Evangel Music Company, Inc., which defendant, his wife and another had organized as a corporation for that purpose. On the cover of the book appears "Written and Compiled by Kenneth H. Wells." A photograph of Mr. Wells also appears thereon. Wells was an ordained minister of an interdenominational group. From 1943 to 1951 he frequently used plaintiff's composition, and was aware of the favor with which plaintiff's "My God and I"

had been received in church circles. The Evangel Music Company, Inc., was originally named a defendant herein, and was referred to as a firm. The corporation was dissolved and plaintiff consented in the District Court that it be dismissed from the case, and this was done.

The District Court found "In composing the accused song, the defendant used the melody of the plaintiff's song which he, the defendant, had committed to memory." The District Court found that the tune in suit was taken from an old Latvian, Italian or Russian folksong, and that tune was in the public domain for years prior to the time plaintiff copyrighted it in 1935. The Court said: " * * * the tune of the song in suit is incapable of being protected by copyright."

Of all the arts, music is perhaps the least tangible. Music is expressed by tonal and rythmic effects. People can enjoy music without a technical understanding or education, but to make music available, someone must write it. To make a song available, someone must bring the notes and words together.

The trial court did not make a specific finding of infringement. However, it did state that only the title of the song, the melody and a few isolated words and phrases are common to both songs. We think there are more than a few isolated words and phrases which are the same. Some of them are so unusual that we cannot believe the similarity was merely the result of chance.

In both the copyrighted song and the accused song there are three stanzas, each comprising four lines plus repetition of the last two lines. In both cases, each of the first and third lines of each stanza has eleven syllables, and the second and fourth lines have ten. In both cases, in the repetition of the fourth line, the first three words are set to soprano notes different from those in the first rendition.

To illustrate some of the similarities. The first two lines of the Wihtol song are:

"My God and I, go in the field together,
We walk and talk as good friends should and do."

In defendant Wells' version:

"My God and I are keeping sweet communion;
We walk and talk as friends along the way."

Also, the first line of the third and last stanza:

Wihtol: "My God and I, will go for aye together."

Wells: "My God and I will walk for aye together."

Wihtol: "We clasp our hands"—in the first stanza.

Wells: "My hand in His"—in the third stanza.

Wihtol: "Meadow's hue"—in the first stanza.

Wells: "Golden hue"—in the third stanza.

The notes in the melody are almost identical. The similarity is more difficult to describe so as to be understood by anyone not trained in music. However, in both compositions the music is written in the key of C in 4-4 time, and the measures and the rests are the same. In the soprano score the notes are identical, and their time values are identical except in six instances of a repeated note. Wihtol has a dotted eighth for the first one, and a sixteenth for the second, while Wells has an eighth for both. The alto and bass scores to fit the soprano score have the same six timing instances. Plaintiff contends, apparently without dispute, "Taking note for note, the soprano scores reckon 80.95% identical, the alto scores 69.84% identical and the bass scores 59.96% identical." Plaintiff does not claim that defendant copied the tenor score of the copyrighted work.

Wells testified he did not have plaintiff's song before him when he composed "My God and I." However, he was thoroughly acquainted with both the words and the music of the plaintiff's song. As this court said: "One may copy from

memory. It is not necessary to such act that the copied article be before him." Edwards & Deutsch Lithographing Co. v. Boorman, 7 Cir., 15 F.2d 35, 37. This Court also held that differences between a copyrighted work and an accused production do not negative infringement, but that a copying of a substantial portion of a copyrighted work calls for a finding of infringement. Chicago Record-Herald Co. v. Tribune Association, 7 Cir., 275 F. 797. We there stated, at page 799: "Whether the appropriated publication constitutes a substantial portion of that which it copyrighted cannot be determined alone by lines or inches which measure the respective articles. We regard the Herald publication as in truth a very substantial portion of the copyrighted article, and the transgression in its unauthorized appropriation is not to be neutralized on the plea that 'it is such a little one.'"

Defendant claims that he obtained the words which he used in his song from a poem composed by one Anna Johnston entitled "My God and I" published in a church bulletin dated October 31, 1949. As this date is long after plaintiff's work had become widely and favorably known, it doesn't make much difference whether defendant copied from plaintiff or whether defendant copied from Johnston who copied from plaintiff.

■ Defendant urges that the title to a copyrighted song is not protected by the copyright. We agree that the title, in itself, is not subject to copyright protection. We think, however, that the title of a copyrighted work should be taken into account when the same title is applied to a work copied from it.

■ We hold that defendant's composition "My God and I" (music and words) is an infringement of plaintiff's composition "My God and I" (music and words). We therefore turn to a consideration of whether plaintiff's copyright was valid.

Defendant argues that plaintiff obtained his tune from an old Russian or Latvian folksong which was in the public domain and not subject to copyright. Defendant further urges that if the copyright be held to be valid, it must be limited to the English text and the choral arrangement which defendant says are plaintiff's only contribution and which defendant does not employ.

■ The language in some court opinions seems to confuse the law of copyrights with that of patents. The Constitution itself differentiates between "authors" and their "writings" from "inventors" and their "discoveries." A copyright protects an original work and is not dependent upon novelty. Baker v. Selden, 101 U.S. 99, 102–103, 25 L.Ed. 841. In Alfred Bell & Co., Ltd. v. Catalda Fine Arts, 2 Cir., 191 F.2d 99, the court said, at page 102: "It is clear, then, that nothing in the Constitution commands that copyrighted matter be strikingly unique or novel. Accordingly, we were not ignoring the Constitution when we stated that a 'copy of something in the public domain' will support a copyright if it is a 'distinguishable variation' * * *" The court also said, at pages 101–102: "Accordingly, the Constitution, as so interpreted, recognizes that the standards for patents and copyrights are basically different." In the same opinion, the court said at page 103: "Originality in this context 'means little more than a prohibition of actual copying.' No matter how poor artistically the 'author's' addition, it is enough if it be his own." In Stein v. Mazer, 4 Cir., 204 F.2d 472, 474 the court said: "Since a copyright is intended to protect authorship, the essence of copyright protection is the protection of originality rather than novelty or invention."

■ The certificate of registration introduced by plaintiff is prima facie evidence under the Copyright Act of the validity of plaintiff's copyright. The burden of proof is on the defendant to overcome this prima facie presumption of validity. National Institute, Inc., v. Nutt, D.C., 28 F.2d 132, 133. To do this, defendant points to a "Foreword" carried on some early editions of plaintiff's

work stating: "The melodic element of this Etude is from a Russian folksong."

■ The only evidence of any antecedent of any part of the copyrighted work is plaintiff's own statement, that during his boyhood days in Riga he heard a tune similar to the melody score of the copyrighted work, played on a hurdy-gurdy. But it was original work on plaintiff's part when, some thirty years later, he devised a calculated melody score thus putting it in shape for all to read. It was quite natural that plaintiff employed similar successions of sound in his writing of the melodic element of his "My God and I." In his application for copyright plaintiff correctly filed "Only for new music now first published."

Defendant relies heavily on Norden v. Oliver Ditson Co., Inc., D.C., 13 F.Supp. 415. However, we think the case at bar falls within the category of Italian Book Company, Inc., v. Rossi, D.C., 27 F.2d 1014. In the Norden case [13 F.Supp. 418], the court said: "I find nothing inconsistent with this in Italian Book Company, Inc., v. Rossi, D.C., 27 F.2d 1014, relied on by the complainant. In that case a Sicilian sailor sang and played his guitar on a long voyage. Sicilian folk songs he had heard and forgotten came back to his memory. He could not read music and such parts of the words and music as he could remember he sang and played by ear. What he could not remember he improvised. In this way he 'learned' a song which he claimed as his own composition. This product differed in words and music from any version of the original which was proved, though the theme was the same and the music

quite similar. The court said: 'There must have been something which Citorello added which brought the old song back into popularity with his own people in this country, and sufficient, I think, to support his claim of copyright.' The Italian sailor may be said to have done something creative or original in improvising portions of the words and music."

Section 7 of the Copyright Act specifically provides for protection of the work of a composer growing out of creations of those who came before. We hold plaintiff's writing of the exact and complete melodic element of "My God and I" was an original work subject to copyright. The writing of the other three parts, alto, tenor and bass, was further original work of the plaintiff. We hold plaintiff's copyright is valid.

[6] Defendant argues that he should not be held liable for the acts of a corporation now dissolved, and insists that he did nothing outside of the scope of his official duties as an officer of the corporation. However, Evangel Music Company, Inc. was formed for the purpose of publishing the book including the infringing composition prepared by defendant. Wells was the dominant influence in the corporation and, in fact, ran its affairs. He personally applied for a copyright on the accused song in his own name. He made the arrangements with the distributor. No individual other than Wells was of any consequence in planning and carrying out the infringing act.

Judgment reversed and remanded with directions to enter judgment for the plaintiff.